**LEON FINKER, INC., d/b/a L. F. Industries, Plaintiff,**

v.

**Joseph SCHLUSSEL, d/b/a the Diamond Registry, Defendant.**

**79 Civ. 0068 (GLG).**

United States District Court, S. D. New York.

May 2, 1979.

---

Brumbaugh, Graves, Donohue & Raymond, New York City, for plaintiff by Edward V. Filardi, M. Andrea Ryan, Robert B. Smith, New York City, of counsel.

Feldman & Feldman, New York City, for defendant by Marvin Feldman, Stephen E. Feldman, New York City, of counsel.

## OPINION

GOETTEL, District Judge:

In this trademark action brought under the Lanham Act, the plaintiff seeks to enjoin the defendant both from using a similar, or identical, mark to its registered trademark, and from engaging in allegedly unfair competition. Plaintiff also seeks to recover monetary damages. A preliminary injunction was sought. Upon the submission of extensive papers and the hearing of argument on this motion, the Court concluded that an evidentiary hearing was necessary in order to resolve the disputed facts. This hearing was consolidated pursuant to

Fed.R.Civ.P. 65(a)(2) with a trial on the merits.[1]

Plaintiff, Leon Finker, Inc. is a New York corporation which has been engaged in the business of cutting and wholesaling diamonds since 1969. Its principal, Leon Finker, has specialized in designing and cutting fancy shaped diamonds since he first entered the business in Belgium in the 1930's. L.F. Industries is a division of Leon Finker, Inc. formed in November of 1977 for the purpose of promoting the company's sale of brilliant cut, triangularly shaped diamonds. The plaintiff is one of only two manufacturers in the United States producing such diamonds.[2]

The defendant, an individual, is also engaged in the wholesaling, although not the cutting, of diamonds. The defendant's diamonds are sold to the trade through a brokerage house, "The Diamond Registry," which he runs (with the assistance of a computer), and through the publication of a newsletter. He has bought a number of cut diamonds from the plaintiff and marketed them in this manner.

As a result of transactions between the plaintiff and the defendant involving triangular shaped, brilliant cut diamonds, certain disputes arose. Before being able to consider these disputes, however, it is necessary to understand something about the history of this type of diamond.

Rough diamonds are only rarely found in triangular shape. When, however, a diamond in the rough has a natural triangular configuration its usage can be maximized by cutting it triangularly. (There would be far too much wastage involved in cutting a diamond with a different natural configuration into a diamond shape). Yet despite their rarity, diamonds so cut never attracted much popular acceptance.

Some years ago, a "brilliant cut"[3] was utilized in the cutting of round and other shaped diamonds in order to enhance their luster and to give them a more brilliant appearance. This brilliant cut was first applied to a triangularly shaped stone in 1961 by the Asscher Diamond Works of Amsterdam. These Asscher diamonds had rounded triangular sides and a total of 74 facets. Asscher immediately began referring to this type of diamond as the "trilliant" and indicated that it expected the term "trilliant" to become a lower cased dictionary word, much like "marquise." *See, Jewelers Circular-Keystone Directory,* at page 21 (June 20, 1961). Trilliant was, in fact, a rather obvious name to apply to a triangle shaped, brilliant cut diamond as it was (as noted in the press release of the public relations firm of N. W. Ayer & Son in January of 1962), simply a contraction of the words "triangle" and "brilliant."

Asscher's trilliant diamond never became an important item in the diamond business in this country. Perhaps this is due to the fact that a diamond with rounded sides, even though three pointed, can be cut into one of the more conventional shapes, such as round, without excessive wastage. Consequently, the few dealers in the United States who did cut triangularly shaped diamonds chose rather to deal in straight-sided triangles with the corners slightly bevelled so as to avoid creating too sharp a point on the triangle. (If examined carefully, it can be seen that these diamonds, with the bevelling, actually have a total of nine sides.)

While the terms "trilliant" and "trilliant cut" were originally restricted to the Asscher type diamond, they came, in time, to refer to any triangularly shaped, brilliant cut diamond. (The gemological textbooks, however, continue to make an unclear distinction between the original Asscher type of rounded trilliant and the now more common straight sided trilliant). And although

---

1. The defendant's counterclaims were, however, severed for the purpose of this hearing.

2. The only other company producing such diamonds is the Henry Meyer Diamond Company, which is located near the plaintiff in midtown Manhattan, New York.

3. A "brilliant cut" is achieved by cutting additional facets on the bottom of the diamond which show through to the top.

these terms are not extensively known even today, as triangularly shaped diamonds command only about 1% of the market for large diamonds, the evidence is clear that, within its rather limited market, a "trilliant" is any triangularly shaped, brilliant cut diamond.

In the spring of 1977, as the result of the defendant's solicitation of suppliers for his Diamond Registry business, the plaintiff and the defendant met, and the defendant became interested in the plaintiff's trilliant diamonds, marketed under the name "Trillion," which that company had then begun to emphasize (apparently upon the urging of Marvin Finker, Leon's son, who had joined the business a few years prior). That fall, the defendant took some of the plaintiff's diamonds on consignment and began advertising them in his bulletin. Promoting these diamonds under the plaintiff's mark, "Trillion," the defendant in his advertising stated that the "trillion cut" was "the most exciting new cut introduced in recent years." In turn, the defendant's customers, retail dealers, ran their own ads speaking of the "trillion cut" and the "Trillion" diamond.

Plaintiff applied for trademark registration of the mark "Trillion" in 1977. At that time the plaintiff was aware of the existence and usage of the trade word "trilliant." This fact was discussed with counsel (different attorneys than those representing plaintiff in this action) during the course of applying for registration. It was decided, however, not to call the attention of the Patent and Trademark Office to the possible conflict of the proposed mark with the trade term "trilliant." Conflicting testimony was given as to the reasons for this decision. The former attorneys themselves were not called to testify.

In the application for registration it was claimed that the first use of the term "Trillion" was made in May of 1972 and that its commercial use commenced in February, 1973. In support of this claim, the plaintiff produced a uniform form of memorandum substantially in the handwriting of Leon Finker, dated May 24, 1972. The word "Trillion," however, was inserted in the handwriting of his son. It is this Court's conclusion that the document was altered at a later date in order to substantiate a claim of an earlier usage. On the evidence presented, it does not appear that plaintiff was using "Trillion" as a mark until 1976 or 1977, when the son, Marvin, became active in the business and saw its possible commercial value. Any uses prior to that time were simply misspellings of the generic term. (The evidence demonstrated that neither Finker nor Schlussel were good or consistent spellers.) In any event, registration was granted on March 21, 1978.

Late in 1977, or early 1978, the defendant began aggressively to seek from the plaintiff an agreement designating him as the exclusive representative for the "Trillion" diamonds. The defendant asserts that an oral agreement to this effect was reached. The plaintiff denies this assertion. It is clear, however, that at about this time a letter was sent by the plaintiff to the defendant authorizing him to use the mark "Trillion" in advertising the triangular shaped diamonds obtained from it, provided that he use it only in connection with plaintiff's diamonds, and only with the trademark registration notation affixed.

The defendant did not comply with these instructions. In an article published in the *American Jewelry Manufacturer* (July, 1978), the defendant indicated that he had developed a new type of cut called the "Trillion cut" which would be advertised under the mark of "Solitaire For a Trillionaire," and which would be available only from the Diamond Registry. The defendant's diamond was also, at other times, marketed under the mark "Trillionaire." Moreover, the defendant's retail customers were advertising the plaintiff's diamonds, and using its mark, without the registration notation, or any indication that it was a mark of the plaintiff. (The defendant denies knowing that his retail dealers were advertising in this fashion, but offered no proof to indicate that he was giving any instructions to such dealers with respect to proper use of plaintiff's mark.) Ads of this nature ap-

peared in New Jersey magazines and in Hartford, Connecticut, newspapers.[4]

In an attempt to resolve the disputes arising from the alleged breach of the exclusive representation agreement by the plaintiff, and the claimed trademark violations by the defendant, an arbitration proceeding was initiated before the Board of Arbitrators of the Diamond Dealers Club, with defendant seeking $100,000 in damages and the plaintiff cross-claiming for certain of its diamonds still in the possession of the defendant. The Diamond Dealers Club wisely refused to involve itself in the dispute concerning the trademark registration and alleged infringement. (The ultimate decision of the Arbitrators was that plaintiff would pay the defendant $5,000 for the advertising expenses, the defendant would return or pay for the goods held on memorandum, and the parties would share the arbitration costs.) This action was then commenced to decide the alleged trademark and unfair competition claims.

### Trademark Claims

The plaintiff alleges that in using, and allowing his retailers to use, the mark "Trillion" without indicating that it was the registered trademark of the plaintiff, and in using for his own benefit the similar marks of "Solitaire For a Trillionaire" and "Trillionaire," the defendant has infringed upon its trademark in violation of the Lanham Act. Before the Court can decide this question, however, it is first necessary to determine whether the plaintiff's mark "Trillion" is a valid mark, properly entitled to trademark protection.

It is established law that a generic term, that is a term which refers, or is understood to refer, to the genus of goods being sold, even if it has acquired a secondary meaning, cannot become a protected trademark. *McGregor-Doniger v. Drizzle Inc.,* 599 F.2d 1126, (2d Cir., 1979); *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4 (2d Cir. 1976); *CES Publishing Corp. v. St. Regis Publications, Inc.,* 531 F.2d 11 (2d Cir. 1975). Nor can the phonetic equivalent, *Miller Brewing Co. v. G. Heileman Brewing Co.,* 561 F.2d 75 (7th Cir. 1977); *Weiss Noodle Co. v. Golden Cracknel and Specialty Co.,* 290 F.2d 845, 48 CCPA 1004, or a misspelling (which does not alter the generic significance to the buyer), *American Aloe Corp. v. Aloe Creme Laboratories, Inc.,* 420 F.2d 1248 (7th Cir. 1970), of that generic term become the subject of trademark protection. *See,* J. T. McCarthy, *Trademarks and Unfair Competition,* § 12:12 (1973).

After a careful review of the facts of the instant action, the Court concludes that the term "trilliant" is generic (referring to the entire class of brilliant cut, triangular diamonds). Thus neither it nor its phonetic or misspelled equivalents are eligible for trademark protection. The plaintiff contends, nevertheless, that the trademark "Trillion" is distinct in spelling, pronunciation and meaning from "trilliant" and that it should therefore not be considered an equivalent to the generic. The Court cannot agree. The terms "trilliant" and "Trillion," though somewhat visually dissimilar, are virtually indistinguishable in sound.[5] Similarity in sound has been

---

4. At this same time the plaintiff was also seeking on its own, to advertise its trilliant diamonds. In an article in the *National Jeweler* (May, 1978), headlined "Triangle-Brilliant Gets Notice as Diamond Prices Rise," both the plaintiff and the Henry Meyer Diamond Companies were cited as doing a big business in 50 facet triangle brilliant diamonds and it was noted that plaintiff had a trademark on "Trillion," while the Meyer Bros. simply called their diamond the "trilliant." Reference was made to defendant's use of plaintiff's diamonds as being "one of the firms distributing L.F. Industry's

'Trillion.' " Both plaintiff's principal and defendant were quoted in the magazine article.

5. In light of the common tendency to slur a consonant at the end of a word, it is evident to this Court that the two words are phonetically virtually indistinguishable. We are told that this is particularly true when speaking French, which is the language in which much of the diamond business is conducted, where they apparently always drop a final consonant. Regardless of the difficulties in French, the depositions and trial of this action were continually plagued by a difficulty in determining whether

held to be a basis for cancelling competing registration marks, even though they relate to different products. *Krim-Ko Corp. v. Coca Cola Bottling Corp. of New York,* 390 F.2d 728, 55 CCPA 903 (1968). When dealing with goods which are frequently purchased or traded by the spoken word (as much of the diamond business is carried out), similarity of sound has been given particular importance. *See, Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons,* 523 F.2d 1331 (2d Cir. 1975); *Johnson & Johnson v. Colgate-Palmolive Co.,* 345 F.Supp. 1216 (D.N.J.1972); *Spangler Candy Co. v. Crystal Pure Candy Co.,* 235 F.Supp. 18, (N.D.Ill.1964) *aff'd,* 353 F.2d 641 (7th Cir. 1965). Thus it has been held that, "[s]light differences in the sound of similar trademarks will not protect the infringer." *G. D. Searle & Co. v. Chas. Pfizer & Co.,* 265 F.2d 385 (7th Cir. 1959).[6]

The Court does not believe that the trademark "Trillion," simply by substituting an "o" for an "a" and dropping a final "t," has, to any significant degree, distinguished itself from the generic "trilliant." And, to the extent that there are slight distinctions in spelling and meaning, these distinctions become obscured when the two words are pronounced. *See, Russell Chemical Co. v. Wyandotte Chemical Corp.,* 337 F.2d 660, 52 CCPA 807 (1964); *Celanese Corp. v. E. I. DuPont,* 154 F.2d 143, 33 CCPA 857 (1946). (Although the plaintiff claims that it adopted the name "Trillion" because it referred to the amount of money to be made from the diamonds, the Court

does not, in light of the evidence adduced at trial, find this explanation to be credible.) The plaintiff has not, by slightly altering the spelling of a generic term, created a valid, protectable, trademark. *Miller Brewing Co. v. G. Heileman Brewing Co.,* 561 F.2d 75 ("Lite" not a valid trademark for a low caloric beer due to its similarity to the generic term "light"); *American Aloe Corp. v. Aloe Creme Laboratories, Inc.,* 420 F.2d 1248 ("Alo" not a valid trademark due to its similarity to the generic "aloe"). *See also, American Druggists' Syndicate v. United States Industrial Alcohol Co.,* 55 App.D.C. 140, 2 F.2d 942 (1924); *In re Sealol, Inc.,* 168 U.S.Pat.Quart. 320 (TMT & App.B. 1970).[7] Accordingly, as the trademark "Trillion" was not capable of legal registration, no recovery may be had for defendant's alleged infringement on it.

### Unfair Competition Claim

■ The remaining issue to be resolved is whether, despite the fact that the plaintiff's mark was invalidly registered, the defendant may nevertheless be found guilty of engaging in unfair competition under state law. Jurisdiction to reach this question is premised upon 28 U.S.C. § 1338(b) as a claim of "unfair competition" which is "joined with a substantial and related claim under the . . . trademark laws." As plaintiff has raised a substantial, though not prevailing, claim under the trademark laws, and as the unfair competition claim arises out of the same nucleus of facts, this

---

the speaker was saying "Trillion" or "trilliant". The evidence also established that a substantial portion of the diamond business is done orally, either by phone or in person, so that the spoken term is of substantial significance.

**6.** Even were the Court to accept the argument that "trilliant" and its misspelled equivalent "Trillion" were merely descriptive terms, combining the words triangle and brilliant, and had not yet achieved generic standing, this would not help the plaintiff's position. Descriptive words, not indicative of the origin or ownership of the goods, are not capable of registration, *Standard Paint Co. v. Trinidad Asphalt Mfg. Co.,* 220 U.S. 446, 31 S.Ct. 456, 55 L.Ed. 536 (1910), absent proof that a secondary meaning has been established. *CES Publishing Corp. v.*

*St. Regis Publications, Inc.,* 2 Cir., 531 F.2d 11. No proof has been presented in the instant action to show that the mark "Trillion" has, to any substantial degree, acquired a secondary meaning.

**7.** The defendant has also argued that the trademark should be invalidated because of the plaintiff's lack of candor before, and its misleading of, the Patent and Trademark Office. In light of the plaintiff's failure to notify the Patent and Trademark Office of the existence and meaning of the term "trilliant," and the use it made of a doctored memorandum, a strong argument can be made in this regard. Because of the determination of this Court as to the nonregisterability of the term "Trillion," however, this aspect need be pursued no further.

Court may reach this pendent state claim. *See, A. H. Emery Co. v. Marcan Products Corp.,* 389 F.2d 11 (2d Cir. 1968), *cert. denied,* 393 U.S. 835, 89 S.Ct. 109, 21 L.Ed.2d 106 (1968). *But see McGregor-Doniger, Inc. v. Drizzle, Inc.,* 446 F.Supp. 160 (S.D.N.Y. 1978), *aff'd on other grounds,* 599 F.2d 1126 (2d Cir. 1979).[8]

While it is clear that a substantial portion of the unfair competition claim revolves around the challenged use of the mark "Trillion" and the terms "Trillionaire" and "Solitaire for a Trillionaire," unfair competition is not limited to such acts. Unfair competition encompasses a broad range of conduct (much like negligence), and may, in the final analysis, consist of selling goods by means that shock the judicial senses. *See* J. T. McCarthy, *Trademarks and Unfair Competition,* § 1:6 (1973). Thus it has been held that the unfair use by a party of a mark, even though found descriptive and not subject to trademark protection, could, in certain circumstances, be enjoined, and damages awarded. *Flexitized v. National Flexitized Corp.,* 335 F.2d 774 (2d Cir. 1964). In *Flexitized* the court noted that the New York courts had extended unfair competition to encompass cases where there was no allegation of "palming off," and stated that:

> " 'The extension resulted in the granting of relief in cases where there was no fraud on the public, but only a misappropriation for the commercial advantage of one person of a benefit or "property right" belonging to another.' Particularly where the defendant's conduct has involved a clear attempt to profit at the expense of the plaintiff . . . or a breach of confidence by the defendant . . . New York courts have deemed the conduct to be unfair despite the fact that the plaintiff's mark has not acquired a secondary meaning."

*Id.* at 782, quoting *Metropolitan Opera Ass'n v. Wagner-Nichols Recorder Corp.,* 199 Misc. 786, 101 N.Y.S.2d 483, 489 (Sup. Ct.1950). *See also, Electrolux Corp. v. Val-Worth, Inc.,* 6 N.Y.2d 556, 567, 190 N.Y.S.2d 977, 986, 161 N.E.2d 197, 203 (1959).

When the defendant solicited business from the plaintiff he agreed, among other things, to respect plaintiff's mark and to acknowledge the diamonds as being the plaintiff's products. Despite this, however, the defendant then proceeded to advertise the goods as his own and himself as the exclusive source. For example, in the "Christmas Dreams" advertisement, run nationwide, he claimed that the "Trillion" diamond designs "are the exclusive products of the Diamond Registry," a patently false assertion. Through the use of its computerized diamond brokerage system the defendant has disseminated this untrue claim throughout the retail industry. He has attempted through publications and advertising to mislead both his customers and the diamond industry.

The defendant attempts to defend some of the misleading advertising by alleging that it is only the unique shape of the metal ring which makes up the base for the trilliant diamond (and which, in fact, he did develop) that such advertising refers to. The advertisements, however, are not susceptible to this interpretation.

■ While the defendant's use, under these circumstances, of the mark "Solitaire for a Trillionaire" or "Trillionaire" may be permissible conduct, and while the defendant cannot be prevented from utilizing a generic term, his claim of having developed and being the exclusive source of trilliant cut diamonds is clearly improper.[9] The defendant has attempted to trade upon the good will and promotional efforts of the plaintiff. Such conduct constitutes unfair competition and may be enjoined.

8. Although the district court's dismissal of the pendent state claim was not challenged on appeal, the Court of Appeals, nevertheless, indicated some reservation about the correctness of that ruling. At 681, n. 10.

9. This assertion is doubly unfair since the Henry Meyer Diamond Co. also has been marketing triangularly shaped brilliant cut diamonds for a dozen years (referring to them solely by the generic name "trilliant").

In addition, the plaintiff seeks damages for this unfair competition. No damages, however, have been proved and the Court believes it doubtful that the plaintiff can show specific damages, in the nature of lost sales, resulting from the defendant's actions. The diamonds that defendant has been selling were purchased from plaintiff. With respect to defendant's claims, plaintiff is suffering a generalized loss as to which monetary damages would not be adequate compensation. *See, Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc.,* 596 F.2d 70, (2d Cir. 1979). In light of the fact that the Court has held the mark invalid, no damages would be awardable for dilution.[10]

Accordingly, the defendant is hereby enjoined from continuing in its unfair trade practices. In addition, any future advertising by it of a trilliant cut diamond obtained from plaintiff should contain whatever corrective language necessary to rectify his past false and misleading statements.

The plaintiff will settle an order consistent with this decision.

---

**10.** A claim for damages resulting from a violation of the parties' distributor arrangement is one which might have been appropriately referred to the Diamond Merchants Club for arbitration.