ORION PICTURES COMPANY,
INC., Plaintiff,

v.

DELL PUBLISHING CO., INC.,
Defendant.

No. 79 Civ. 2310 (GLG).

United States District Court,
S. D. New York.

June 5, 1979.

Phillips, Nizer, Benjamin, Krim & Ballon, New York City, for plaintiff; Leonard S. Baum, Elizabeth Greenspan, John F. Duane, New York City, of counsel.

Satterlee & Stephens, New York City, for defendant; Robert M. Callagy, John T. Schmidt, New York City, of counsel.

GOETTEL, District Judge:

The plaintiff's motion for a preliminary injunction presents an interesting question concerning the plaintiff's motion picture, derived from a book, and the defendant's paperback version of the book, published to exploit the publicity and interest generated by the movie.

A French author, Patrick Cauvin, published a book in French entitled "$E = MC^2$, Mon Amour" (Éditions Jean Claude Lattés, 1977), which was apparently quite popular in Europe. As a result of the book's success, it came to the attention of an American group headed by the plaintiff, Orion Pictures Company ("Orion"), a New York company, which decided to produce and distribute a film based upon the book. Orion obtained the services of Pan Arts Associates, Inc., whose principal stockholder is director George Roy Hill,[1] to film the story. Pan Arts obtained the motion picture rights to the book and prepared a screenplay from it.

The production of the motion picture retitled "A Little Romance," generated extensive publicity in the news media and the trade journals. This publicity noted that the picture would be directed by Hill, and would star such eminent actors as Sir Lawrence Olivier. Orion states that it has spent, or is committed to spend, over $4 million to advertise and promote the film.

Defendant, Dell Publishing Co., Inc. ("Dell"), a New York corporation, learned in late 1977 of the plan to make the movie based on "$E = MC^2$, Mon Amour," and contracted with the French author and his publisher to obtain the English translation and paperback publication rights to the book. Dell bought the right to market the book under any title it desired but, according to its editorial director, intended from the start to use the same title for the book as would be used by the movie.

Commencing in the spring and continuing through the summer of 1978, officials of Dell negotiated with Orion and attempted to arrange a mutually beneficial tie-in between the release of the book and the movie. In August of 1978, Orion informed Dell of its intention to release the film under the title "A Little Romance." Dell immediately decided to publish its book under the same title, and so instructed its employees.

In early 1979, Orion decided that it would not be in its best interest to go forward with the proposed tie-in agreement. This decision was allegedly based on director Hill's conclusion that, as a result of substantial rewriting and alterations in the story line, the screenplay for the movie had departed from the original book to such a degree that there was no longer much similarity between the two. As an alternative proposal, Orion offered to allow Dell to publish a novel based upon the screenplay.

---

1. Mr. Hill was the director of such popularly acclaimed movies as "Butch Cassidy and the Sundance Kid," and "The Sting."

This offer was found unacceptable by Dell since, besides having already spent $25,000 to obtain the French author's rights to the original work, it also had a royalty arrangement with Cauvin which might have been breached by the sale of a new literary work derived from the screenplay. When the negotiations failed, Orion notified Dell that it would not enter into any tie-in agreement. Orion at no time consented to the use of its title for the paperback book.

Despite the lack of any agreement, Dell, apparently in the belief that Orion had no protectable interest in the title or in the publicity that the movie would generate, went forward with the publication of its paperback under the title "A Little Romance." The defendant also chose to include on the front cover of the book the pronouncement that it was "NOW A MAJOR MOTION PICTURE," along with a drawing of three people who bore noticeable resemblances to Laurence Olivier and the two child stars of the picture (with the Eiffel Tower and Paris in the background). Dell's publicity releases sent to potential wholesalers and retailers of the book rested heavily upon the movie tie-in, commenting that the movie, considering its director and stars, "is sure to receive intense promotion and publicity—that's bound to help the Dell book! * * * the release of the major film will boost sales of this translation of a greatly acclaimed French novel."

Dell published and distributed 125,000 copies of the book throughout the United States and Canada, with wholesale distribution completed on April 26, 1979.[2] The wholesalers in turn have distributed their volumes to retailers and, undoubtedly, many of the books have already been sold to the public.

The plaintiff has moved for a preliminary injunction restraining defendant from using the title "A Little Romance," and from

unfairly competing with it in any manner. The complaint alleges that the defendant has violated section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), section 368–d of the New York State General Business Law (McKinney's 1968), and the common law standard for unfair competition. Plaintiff also seeks an order directing the defendant to reacquire and to destroy all copies of the book previously published and delivered.

The relative rights of the parties, of course, cannot be assessed in a vacuum. The defendant contends that the movie is a relatively faithful transposition of the book to a different medium, and the plaintiff contends that the movie is, at best, only loosely based on the French work. To resolve these differences the Court has read the book and seen the movie.

The basic plot of both works is the same. Two very precocious children, an American girl and a French boy, meet in Paris and have an innocent romance. The romance, however, does not find favor with the girl's family. The children, with the help of an elderly rogue, run away to Italy, are apprehended in Venice, returned to their families in France, and, finally, are permanently and poignantly separated, with the girl's family returning to the United States.

In transforming a written work into a film there are, of necessity, certain changes that have to be made. The average book has several times as much material as the average length movie can absorb. In rare instances, when dealing with a short, simple work, for example Hemingway's "Old Man and the Sea," it is possible to reproduce all of the essential action of the book. In other instances, movies have retained no more of the original book that its title.[3] Occasionally, a film will contain only a portion of the story found in the book.[4]

---

**2.** The printing of the front cover, and the rest of the book, was done in March of 1979. The copyright page states, nevertheless, that the first United States printing was in May of 1979.

**3.** An example would be "Sex and the Single Girl."

**4.** The film "Julia," for example, was based on one chapter of Lillian Helman's autobiographical work "Pentimento."

This movie makes a number of changes, in locations, characters, and details. The additions and deletions, however, are no more than are ordinarily encountered in the transformation of a written work into a film. For instance, the part of the elderly man, played by Olivier, grows from a quantitative presence of 20 percent in the book to one of 40 percent in the motion picture. This proportional change is achieved primarily by deletions of material from the book, rather than by additions to the film.[5] Another change in the film which could have been of some importance, that of advancing the age of the children from eleven to thirteen (preadolescent to adolescent), in fact had little impact on the story line, as the degree of sexual maturity attributed to the characters in the movie did not increase, a result which perhaps indicates a difference in view between France and the United States as to the age of sexual maturity.

Nonetheless, the movie *is* substantially different from, and better than, the book.[6] The book has a series of alternating chapters with each chapter narrated in the first person by one child or the other, setting forth an introspective appraisal of their lives and their relationship to each other. Because the children are not only unusually precocious, but also surprisingly self-aware and mature, these appraisals contain lengthy reflections on society in general which, after awhile, tend to become somewhat tedious.[7] There are extensive passages dealing with the main characters' self-consciousness and their fantasies of things to come.[8] A major theme of the book is that the brilliant child is, as a result

of his superior intelligence, separated from his peers and alienated from the world at large. In contrast the movie avoids much of all this by taking a purely objective view of the children and their relationship. As a consequence, it moves along at a fast and enjoyable pace, and never loses its charm. It is the Court's belief that if one were to read the book first, the entertaining achievement of the film would not be anticipated.

The proper legal result, however, is not self-evident from this critical analysis. The plaintiff charges that the defendant deliberately sought a "free-ride" on the millions of dollars plaintiff is spending on advertising, and that the publication and distribution of the paperback will diminish the popularity of the movie.

■ For a film's title to be protectable under the doctrine of unfair competition, *see* 15 U.S.C. § 1125(a), it is necessary that the title have attained some secondary meaning. Thus, a title which, through publicity and use, has come to be associated in the minds of a substantial number of people with a certain type of film produced by a particular individual, may be protected from use by others. *Warner Brothers Pictures, Inc. v. Majestic Pictures Corp.*, 70 F.2d 310 (2d Cir. 1934);[9] *Brandon v. Regents of the University of California*, 441 F.Supp. 1086, 1091 (D.Mass.1977).

■ The defendant claims initially that since it marketed its book before the picture opened, no secondary meaning in the title could have developed, and thus no unfair competition could have occurred. The

---

5. While Olivier's acting also serves to emphasize this character more in the film and is one of the high points of the movie, he is virtually outshone by two fine child stars, Dianne Lane and Thelonious Bernard. Miss Lane in particular has an unusual charm for a child actor.

6. In this Court's perhaps unsophisticated view, the movie should get at least 3½ stars from all but the most cynical of critics.

7. Considering the popularity of the French book, it is possible that the work has lost something in translation.

8. The boy in particular has been overly influenced by American movies, and substantial portions are devoted to his attempt to make himself and his life conform to the images of the silver screen.

9. The chain of title in *Warner Brothers* started with a play called "The Gold Diggers," the rights to which were acquired by Warner Brothers, which then made two motion pictures (a silent and a talking picture) with the titles "Gold Diggers of Broadway" and "Gold Diggers of 1933." The defendant later produced its picture entitled "Gold Diggers of Paris." Use of the latter title was enjoined.

Court cannot agree. As noted in J. T. McCarthy, *Trademarks and Unfair Competition*, § 10:4, at 277 (1973), "[e]ven if the work has not been released, a sufficient amount of prerelease publicity of the title may cause the title to acquire recognition sufficient for protection." Thus, in *Metro-Goldwyn-Mayer, Inc. v. Lee*, 212 Cal.App.2d 23, 27 Cal.Rptr. 833 (1963), a California court found that as a result of an extensive advertising campaign, the film title "The Wonderful World of the Brothers Grimm" had been publicized sufficiently to achieve a secondary meaning, even though the film itself was at that time uncompleted.

In the instant action the plaintiff similarly engaged in an extensive pre-release advertising campaign to advertise the film and its title.[10] Moreover, it is clear from the defendant's own promotional literature and advertising, and particularly from its cover page inscription, that the defendant was counting on the plaintiff's publicity as the primary means by which to promote the sale of the book. Such an attempt to "pass off" by the defendant is, it has been held, "not only evidence of likelihood of confusion, but of secondary meaning as well." *The National Lampoon, Inc. v. American Broadcasting Co.*, 376 F.Supp. 733, 747 (S.D.N.Y.), *aff'd*, 497 F.2d 1343 (2d Cir. 1974).

Even if no secondary meaning in the title "A Little Romance" had as yet been firmly established, this would not preclude relief. In *W. E. Bassett Co. v. Revlon, Inc.*, 435 F.2d 656, 661 (2d Cir. 1970), the Court held that when dealing with a descriptive term (which would include a film title) "an inference of secondary meaning, properly supported, seems to be enough." *See Blake Publishing Corp. v. O'Quinn Studios, Inc.*, No. 79 Civ. 783 (S.D.N.Y. May 1, 1979). At a minimum, such an inference of secondary meaning has been established here. Moreover, there appears to be growing support for the proposition that a secondary meaning "in the making" should be protected, at least to the extent of preventing intentional

attempts, as by the defendant here, to capitalize on the efforts and goodwill of others. 3 R. Callmann, *Unfair Competition Trademarks and Monopolies*, §§ 77.3, at 356 (3d ed. 1971); *Blake Publishing Corp. v. O'Quinn Studios, Inc., supra*; *The National Lampoon, Inc. v. American Broadcasting Co.*, 376 F.Supp. at 347.

■ Relief may also be afforded to the plaintiff under section 368–d of the New York State General Business Law, (McKinney's 1968), and New York's common law of unfair competition, claims over which this Court has pendent jurisdiction. *Gibbs v. United Mine Workers*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Under New York law, relief is not limited to situations where the plaintiff has proven a secondary meaning in the mark or title. *See, e. g., Flexitized Inc. v. National Flexitized Corp.*, 335 F.2d 774 (2d Cir. 1964); *Finker v. Schlussel*, 469 F.Supp. 674, (S.D.N.Y.1979); *National Lampoon Inc. v. American Broadcasting Co.*, 376 F.Supp. at 747; *Allied Maintenance Corp. v. Allied Mechanical Trades*, 42 N.Y.2d 538, 543–44 n.2, 399 N.Y. S.2d 628, 631 n.2, 369 N.E.2d 1162, 1164 n.2 (1977); *Santa's Workshop Inc. v. Sterling*, 282 App.Div. 328, 122 N.Y.S.2d 488 (3d Dep't. 1953). Rather, the controlling question in determining whether there has been a state law violation is "whether the acts are fair or unfair, according to principles recognized in equity." *Santa's Workshop, Inc. v. Sterling*, 282 App.Div. at 329–30, 122 N.Y.S.2d at 489. Utilizing this standard, it is clear to this Court that the defendant acted unfairly in using the title "A Little Romance," and in explicitly advertising to be the same work as the film.

■ Having determined that the title "A Little Romance" is sufficiently identifiable with the plaintiff's film to be entitled to protection from unfair competition, the Court must next determine whether there is any likelihood that an "ordinarily prudent purchaser" would be "misled, or indeed simply confused, as to the source of the goods in question." *Mushroom Makers, Inc. v. R.*

---

**10.** The plaintiff alleges that at least $2.5 million have been spent in advertising between mid-April and May 18, 1979, for promotion prior to two waves of nationwide openings on May 11 and May 18. As stated above, plaintiff estimates that the total advertising expenditures for the film will exceed $4 million.

G. Barry Corp., 580 F.2d 44, 47 (2d Cir. 1978), cert. denied, —— U.S. ——, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1978).[11] In this regard it is clear that no consumer could confuse, literally, the book with the movie. Consumers are, however, interested in the transmedium relationship of such works. While a person buying the book after seeing the movie would, if he studied the credits carefully,[12] realize that he was purchasing the original literary work and not a novel based on the screenplay, he would be likely to assume that the book bore a very close resemblance to the film, especially in light of the inscription, "NOW A MAJOR MOTION PICTURE." Conversely, a person attending the movie, after reading the book, would be quite surprised at the different impact achieved by the film. The defendant's book, by virtue of its title and inscription, gives the impression that it is the "official" novel version of the film, and therefore highly similar in content to it. In promoting such an impression the defendant has misled the public.

■ In determining the relief to be afforded, the bad faith of the defendant in adopting the plaintiff's title and art work, and in overstating the relationship between the film and the book, are substantial factors to be considered. Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492, 495 (2d Cir.), cert. denied, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). See McGregor-Doniger, Inc. v. Drizzle, Inc., 599 F.2d at 1130; Mushroom Makers Inc. v. R. G. Barry Corp., 580 F.2d at 47. In view of the likelihood of consumer confusion, plus the possible injurious effect the book might have upon the public's desire to see the movie, injunctive relief is appropriate. Safeway Stores, Inc. v. Safeway Properties, Inc., 307 F.2d.495 (2d Cir. 1962). The effect of the infringement and unfair competition in this instance, as is usually the case with claims of this nature, is neither determina-

ble nor compensable by money damages. See Omega Importing Corp. v. Petri-Kine Camera Corp., 451 F.2d 1190, 1195 (2d Cir. 1971); National Lampoon Inc. v. American Broadcast Cos. Inc., supra.

The practical problem in framing the appropriate relief, however, is that the books are already in the hands of retailers and the reading public. It would be difficult, if not impossible, to recapture them. Consequently, the only injunction which will issue at this time pertains to subsequent printings of the book. As to these, the defendant will be enjoined from using the title, art work or other representations which state or imply a greater relationship between the two works than actually exists. In addition, the defendant's promotional materials must be revised immediately to indicate the actual nature of the relationship between the book and the movie. The parties will settle an appropriate order.

SO ORDERED.

---

11. While a showing of likelihood of confusion is necessary for recovery under section 43(a) of the Lanham Act and under the standards for common law unfair competition, such a showing is not required under section 368–d of the New York State General Business Law. Allied Maintenance Corp. v. Allied Mechanical Trades, supra.

12. This, of course, should not be necessary, as the law does not require that such goods be "analyzed and dissected by the purchasing public" in order to determine their true origin, McGregor-Doniger, Inc. v. Drizzle, Inc., 599 F.2d 1126 at 1134 (2d Cir. 1979).