**TRI–STAR PICTURES, INC., Plaintiff,**

v.

**Kurt UNGER, Leisure Time Productions, B.V., Academy Pictures, A.G., and David N. Bottoms and Hon. Raya S. Dreben as Executors of the Estate of Samuel Spiegel, Defendants.**

**Leisure Time Productions, B.V., Third–Party Plaintiff,**

v.

**Columbia Pictures Industries, Inc., Columbia Pictures Entertainment, Inc. and Horizon Pictures, G.B., Third–Party Defendants.**

No. 88 Civ. 9129(DNE).

United States District Court, S.D. New York.

Jan. 6, 1999.

˙ Ira S. Sacks, Fried, Frank, Harris, Shriver & Jacobson, New York City, for Plaintiffs.

Ira S. Sacks, Fried, Frank, Harris, Shriver & Jacobson, for Third-Party Defendants.

## OPINION & ORDER

EDELSTEIN, District Judge.

### Background

The complete history of this case is found in *Tri–Star Pictures, Inc. v. Unger,* 14 F.Supp.2d. 339 (S.D.N.Y.1998); therefore, only those facts needed to resolve the present motion are set forth herein.

Plaintiffs, Columbia Pictures Industries, Inc. ("Columbia") and Academy Pictures A.G. ("Academy") (collectively, "Plaintiffs") brought an action for trademark infringement, unfair competition, and dilution and injury to business reputation pursuant to 15 U.S.C. § 1125, § 360–1 of the New York General Business Law, New York Law, and the common law against Defendants Leisure Time Productions, B.V. ("Leisure Time") and Kurt Unger ("Unger") (collectively, "Defendants"), to permanently enjoin Leisure Time and Unger from releasing, distributing, or advertising in the United States, their produced, but unreleased, motion picture entitled "Return from the River Kwai" ("Return") using that title or any other title containing the words "River Kwai" or any other confusingly similar titles. The case was tried as a bench trial from July 14–16, 1997.

In a July 13, 1998 opinion, this Court held that Plaintiffs mark "River Kwai" was entitled to trademark protection and granted the injunctive relief that Plaintiffs sought. *See Tri–Star,* 14 F.Supp.2d. at 359. Having found that Defendants engaged in willful infringement, this Court also held that this was an "exceptional case" that was ripe for an award of attorney's fees and costs pursuant to § 35 of the Lanham Act, 15 U.S.C.

§ 1117(a). *See id.* at 364.[1] On August 11, 1998, Defendants filed a notice of appeal proposing to raise the following issues:

1. Whether the Court properly granted the injunction sought
2. Whether evidence of the history surrounding the reality of a geographical location known as the "River Kwai" was improperly excluded
3. Whether the Court failed to make an essential determination that the alleged mark "River Kwai" was entitled to protection
4. Whether the Court failed to make an essential determination regarding whether the alleged mark "River Kwai" was a generic, descriptive, suggestive or fanciful mark

Defendants' Notice of Appeal, p. 11.

Thereafter, on October 13, 1998, this Court received a letter from counsel for Academy, asking for a pre-motion conference to discuss moving this Court to require Defendants to post a security bond for costs of the appeal, including attorney's fees, pursuant to Rule 7 of the Federal Rules of Appellate Procedure ("Rule 7"). *See* Letter from Richard Lehv, counsel for Academy, to Judge David N. Edelstein of 10/13/98.[2] *Inter alia,* counsel for Academy advised this Court that Defendants' counsel had withdrawn from its representation of Defendants and emphasized that Defendants, who are foreign residents that allegedly have no assets in the United States, "engaged in vexatious litigation conduct." *Id.* at p. 2. Thus, Academy expressed its concern that if Defendants' appeal is unsuccessful and Academy is awarded attorneys' fees on appeal, it may be unable to recover those fees from Defendants. *See id.* This Court initially scheduled a pre-motion conference to address this matter for October 26, 1998.

Defendant Unger responded to Academy's request with a letter to this Court dated October 19, 1998. *See* Letter from Kurt Unger to Judge David N. Edelstein of 10/19/98. Unger confirmed that his attorneys had withdrawn from representing him and Leisure Time and that new counsel had not yet been retained. *See id.* at p. 1. He disclosed nothing regarding either his or Leisure Time's financial capabilities or assets in the United states. Unger also requested that this Court reschedule the October 26, 1998 pre-motion conference for after he had found new representation. *See id.* at p. 2. This Court determined that adjourning the conference for two weeks until November 9, 1998 would afford Defendants ample time to retain new counsel.

At the November 9, 1998 pre-motion conference, Unger appeared pro se for himself and for Leisure Time. When this Court questioned why he had not yet obtained new counsel, Unger responded that if this Court permitted Academy to proceed with its motion he would find new representation at that time. *See* Transcript of Pre–Motion Conference dated 11/9/98 ("Pre–Motion Trans."). Unger again made no assertions concerning his or Leisure Time's financial status. Thus, this Court decided to allow Academy to make its motion. *See id.*

Academy submitted its motion papers to this Court on November 16, 1998. This Court received Unger's response on November 23, 1998. At that time, Unger still had not retained counsel. Unger's response simply consisted of his own affidavit, dated November 20, 1998, opposing Academy's motion. *See* Affidavit of Defendant Kurt Unger in Opposition to Motion by Plaintiff Academy Pictures A.G. for Security for Costs Including Attorney's Fees on Appeal ("Unger Aff."). In that affidavit, Unger alleged that

---

1. This Court held that "Plaintiffs are entitled to an award of attorney's fees and costs for pursuing this litigation pursuant to a separate application and hearing." *Tri–Star v. Unger,* 14 F.Supp.2d. at 364 (citations omitted). Plaintiffs and Defendants have provided this Court with memoranda in support of and in opposition to an award of attorney's fees and costs to Plaintiffs. This Court is presently considering those arguments.

2. In its October 13, 1998 letter, Academy did not enumerate a specific dollar amount for the requested bond. Academy now requests a bond in the amount of $50,000 in its motion papers to this Court. *See* Notice Of Motion Of Academy Pictures, A.G. For Security For Costs Including Attorney's Fees On Appeal at p. 2.

Defendants offered to reimburse Academy for "the claimed legal fees that this [C]ourt awarded." *See* Unger Aff. at ¶ 4.[3] Moreover, Unger argued that attorney's fees should not be regarded as costs under Rule 7 and that any requirement to post security would deny Defendants due process because they do not possess the necessary funds to enable them to post a bond, thereby, precluding their appeal. *See id.* at ¶¶ 6–7. To support his contention that this Court cannot consider attorney's fees, Unger, apparently assuming that he was citing the Federal Rules of Appellate Procedure, quoted Moore's Federal Practice as prevailing law, which states that "Attorney's fees ... are not considered to be costs under Appellate Rule 7." *See* Unger Aff. at ¶ 6 (quoting 20 James W. Moore et al., Moore's Federal Practice ¶ 307.10[2] (3d ed.1997)).

## Discussion

### A. The Purpose of Rule 7:

Rule 7 of the Federal Rules of Appellate Procedure states in pertinent part:

Bond for Costs on Appeal in Civil Cases: The district court may require an appellant to file a bond or provide other security in such form and amount as it finds necessary to ensure payment of costs on appeal in a civil case.

Fed. R.App. P. 7. The policy underlying Rule 7 is "to protect the rights of appellees brought into appeals court by ... appellants" who "pose[ ] a payment risk because [they have] no assets in the United States." *Adsani v. Miller*, 139 F.3d 67, 75 (2d Cir.1998).

■ In the case at bar, both Defendants are "payment risks", having failed to establish their financial soundness to this Court. Neither is a resident of the United States, and neither possesses assets in the United States. Furthermore, on three occasions, Defendants neglected to demonstrate to this

Court that in the event they lose their appeal and the Second Circuit awards costs, including attorney's fees, to Plaintiffs, any such award will not be nugatory. In their letter of October 19, 1998 to this Court responding to Academy's request of a pre-motion conference, Defendants could have included some financial representations to attempt to satisfy Academy's apprehensiveness. Defendants had a second opportunity to rebuff Academy's assertions regarding Defendants' financial circumstances at the November 9, 1998 pre-motion conference. Again, Defendants failed to do so. Finally, in his affidavit in opposition to Academy's motion, Unger could have alleged that he or Leisure Time possess sufficient financial capabilities to cover any award of costs if they were to lose the appeal. Instead, Unger merely offered conclusory statements in his affidavit that neither he nor Leisure Time "have the funds or other necessary assets to enable [them] to post a bond as demanded by Academy." Unger Aff. at ¶ 7.

The Second Circuit has stated that "[s]omething more than conclusory assurances ... must be required of someone with no assets in the country" to substantiate his or her financial situation. *Adsani*, 139 F.3d at 76. Defendants have not provided any specific information to this Court regarding their finances. Moreover, unlike the appellant in *Adsani*, who complained that the district court in that case handled the request for a bond simply through letters to the court instead of through formal motion papers, this Court afforded Defendants a full opportunity to litigate their opposition to Academy's motion. *See id.*

Additionally, Unger's statement in his affidavit that neither he nor Leisure Time has enough cash or assets to post the requested $50,000 and that any such order would deny them their due process to appeal this Court's

---

3. This Court does not know what was the exact dollar amount of the offer. Further, Unger's statement regarding reimbursement of the fees that this Court awarded is somewhat confusing because this Court has not yet awarded a precise amount to Academy for their expenses incurred pursuing this litigation through trial. Pursuant to this Court's holding in its July 13, 1998 decision that Plaintiffs were entitled to attorney's

fees, Academy submitted motion papers requesting that this Court amend its judgment to include an award of $494,403.28. *See* Notice Of Motion Of Academy Pictures, A.G. To Amend Judgment To Include Award Of Attorney Fees And Costs. This Court, therefore, can only surmise that the "claimed legal fees" to which Unger referred are the $494,403.28 that Academy claims in its motion papers to this Court.

July 13, 1998 decision, flatly contradicts his earlier statement in his affidavit that Defendants offered to "mak[e] Academy whole" by paying their claimed legal fees that this Court awarded, which apparently may amount to hundreds of thousands of dollars. *See* Unger Aff. at ¶¶ 4, 7; *supra* notes 1 and 3. If Defendants are insolvent to the point that they cannot afford a $50,000 bond, it is bewildering for this Court to comprehend how Defendants could procure enough capital to pay Academy for its legal fees through trial.

### B.  Unger's Bad Faith:

■ It is also proper to require the posting of a bond pursuant to Rule 7 when a party has engaged in a course of "vexatious" conduct throughout a litigation. *See, e.g., Haberman v. Tobin,* No. 74 CIV. 5740, 1981 U.S. Dist. Lexis 11358 at *2 (S.D.N.Y. March 4, 1981). This Court specifically stated that "[t]he record is replete with evidence that Unger acted in bad faith in choosing the title Return for his motion picture and for refusing to change it in spite of numerous complaints that the title infringed on the rights" of the owner of the trademark Bridge on the River Kwai ("Bridge"). *Tri–Star,* 14 F.Supp.2d. at 351. A brief review of this Court's findings with regard to Unger's conduct is necessary to demonstrate the extent of his bad faith.

Unger insisted on calling the movie Return even though (a) it was not a sequel to Bridge, (b) there was no plot link between the two movies, (c) Return did not open with a film clip of the last few minutes of Bridge, (d) in Return, there was no whistling or playing of the "Colonel Bogey March", the song that has become synonymous with Bridge, (e) other than a brief reference at the beginning of the film, the words "River Kwai" never appear in Return, and (f) after the first few minutes, there is not even a river in the picture. *See id.* Defendants refusal to change the name of the film to exclude the words "River Kwai" despite objections to and protests of the title since 1978, stemmed from an intention to trade on the goodwill, fame, and reputation of Bridge. *See id.* at 352. Further, Unger admitted "that al-though consumers might believe, incorrectly, that Return is a sequel to Bridge, this fact was of no concern to him." *Id.* In fact, Unger's promotional brochure of Return that he distributed at the Cannes Film Festival included a section almost exclusively devoted to Bridge, and Defendants released Return in Japan with the title "Bridge on the River Kwai II". *See id.* Finally, at trial, Unger "was evasive, repeatedly impeached by his prior sworn statements, [and] refused to admit or begrudgingly admitted stipulated facts." *Id.*

### C.  Due Process Concerns:

■ Defendants' assertion that the imposition of a bond will offend tenets of due process is unfounded. While Defendants possess a right to appeal to the Court of Appeals pursuant to 28 U.S.C. §§ 1291 and 1338, that right is not absolute and may be limited by statute requiring, for example, the "posting of security for 'expenses, including counsel fees, which may be incurred' on appeal." *Adsani,* 139 F.3d at 77 (quoting *Cohen v. Beneficial Loan Corp.,* 337 U.S. 541, 551 552, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949)). Indeed, the "government has the power 'to close its courts ... if the condition of reasonable security [to protect appellee from loss] is not met.' " *Id.* (quoting same).

Unger, asserts that it would be a denial of due process for this Court to impose a bond as a condition for taking an appeal because Defendants are unable to pay. In *Adsani,* however, the Second Circuit made it clear that where a party "has no assets in the United States and [has] failed to adduce any credible evidence of an inability to pay" the requirement of a bond to appeal does not constitute a due process violation. *Id.* at 79; *see supra* part A. The Second Circuit also emphasized that a case where the appellant poses a payment risk and acted in bad faith is very different from one in which it was undisputed that the appellants lacked financial stability and pursued their action in good faith. *Adsani,* 139 F.3d at 78. The Second Circuit cited *Boddie v. Connecticut,* 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971), which held that a state statute requiring payment of court fees and costs to gain ac-

cess to state courts for purposes of divorce violated due process. *See id.* The Second Circuit stated that in *Boddie,* the appellants' proved insolvency and established good faith was "the deciding factor." *Id.* Consequently, Defendants' unsubstantiated insolvency and demonstrated bad faith must be a dispositive consideration here.

D. The Merits of the Appeal:

█ The Court of Appeals has also recognized that a district court's prejudging of a case's chances on appeal is a necessary byproduct of the imposition of a bond pursuant to Rule 7. *See id.* at 79. In fact, the Second Circuit reasoned that because a district court is "familiar with the contours of the case appealed, [it] has the discretion to impose a bond which reflects its determination of the likely outcome of the appeal." *Id.* (citation omitted). The Second Circuit, therefore, implicitly invited district courts to formally assess the merits of an appeal when determining whether to impose a security bond.

Accordingly, this Court considered the issues that Defendants raise on appeal and finds that they are wholly without merit. The four issues that Defendants propose in their notice of appeal are: (1) whether this Court properly determined that the mark "River Kwai" is entitled to protection, (2) whether this Court improperly excluded evidence attempting to prove the actual existence of a location known as "River Kwai", (3) whether this Court erred by allegedly not categorizing the mark "River Kwai" as a generic, descriptive, suggestive, or fanciful mark, and (4) whether this Court, having determined that the mark "River Kwai" is a protectable trademark, properly granted an injunction against Defendants. *See* Defendants' Notice of Appeal, p. 11.

Claim 1: Finding that the mark "River Kwai" deserves protection.

In its July 13, 1998 opinion, this Court comprehensively analyzed the mark "River Kwai" to determine whether it is a valid trademark. *See Tri–Star,* 14 F.Supp.2d. at 347–54. This Court stated that "[g]enerally, a mark receives trademark protection when it acquires secondary meaning." *Tri–Star,* 14 F.Supp.2d. at 348 (citation omitted). This Court explained that "[s]econdary meaning refers to the protection given to geographic or descriptive terms that a producer has used to such an extent as to lead the general public to identify the mark [with] the producer, thus permitting producers to protect an otherwise unprotectable mark." *Id.* at n .4 (citations omitted). Over the next eight pages of the decision, this Court carefully discussed whether Plaintiffs successfully established that "River Kwai" has attained secondary meaning, ultimately concluding that the mark is worthy of trademark protection. *See id.* at 347–54. Therefore, this Court fails to see how Defendants can in good faith argue that this Court "failed to make an essential determination that the ... mark 'River Kwai' [is] entitled to protection." Defendants' Notice of Appeal, p. 11.

Claims 2 and 3: Excluding evidence regarding an actual place called "River Kwai" and Allegedly failing to categorize the mark "River Kwai".

While Defendants propose to argue these two points on appeal, this Court finds that even assuming that both are accurate, both are negligible. The only relevant concern is whether the mark "River Kwai" qualifies for secondary meaning. The Second Circuit has stated that

it is well established that where the title of a movie ... has acquired secondary meaning—that is, where the title is sufficiently well known that consumers associate it with a particular author's work—the holder of the rights to that title may prevent the use of the same or confusingly similar titles by other authors.

*Rogers v. Grimaldi,* 875 F.2d 994, 997 (2d Cir.1989) (citations omitted).

Furthermore, while courts have generally refused to restrict the use of a "geographically descriptive term ... under § 43(a) of the Lanham Act ... a geographic name may be protected if secondary meaning can be established." *Jewelers of America, Inc. v. Amirghanyan,* 115 F.R.D. 274, 277 (S.D.N.Y. 1987). Thus, any evidence that "River Kwai" is an actual place is immaterial because this Court found secondary meaning in the mark "River Kwai".

Additionally, it is incorrect for Defendants to allege that this Court never identified the

mark as generic, descriptive, suggestive, or fanciful. Indeed, in defining secondary meaning, this Court stated that "[s]econdary meaning refers to the protection given to geographic or *descriptive* terms." *Tri–Star,* 14 F.Supp.2d. at 348 n. 4 (emphasis added). Moreover, while suggestive or fanciful terms, which are inherently distinctive, are automatically entitled to protection, and generic marks are never afforded trademark protection, descriptive marks are eligible for protection only when secondary meaning attaches. *See Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.,* 973 F.2d 1033, 1039 (2d Cir.1992) (citing *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 768–69, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992)). Therefore, by undertaking secondary meaning analysis in its July 13, 1998 decision, this Court implicitly identified the mark "River Kwai" as a geographically descriptive term.

Claim 4: Granting the Injunction Plaintiffs Sought.

This Court determined that the release of *Return* would likely cause confusion among consumers and concluded that the "risk of irreparable injury flowing from [that] likelihood of confusion" warranted the imposition of an injunction against Defendants. *See Tri–Star,* 14 F.Supp.2d. at 359 (citing *LeSportsac, Inc. v. K Mart Corp.,* 754 F.2d 71, 79 (2d Cir.1985). This Court also held that not only did Defendants violate the Lanham Act, but they infringed upon New York law and the common law, providing "further support for the issuance of an injunction." *Id.* at n. 18. Moreover, when it is clear to a court that a likelihood of confusion exists and that a party is counting on the success of another party's product to promote the sale of its own, granting an injunction is appropriate. *See, e.g., Orion Pictures Co., Inc. v. Dell Publishing Co., Inc.,* 471 F.Supp. 392 (S.D.N.Y.1979) (holding that imposing an injunction is proper where a book publisher sought to cash-in on the prior success and marketing of a movie). Thus, awarding the injunction that Plaintiffs sought to prevent Defendants from capitalizing on the success of *Bridge* was a proper remedy.

E. Imposition of a Bond

That Defendants raise meritless issues on appeal, issues that were sufficiently dealt with on the district court level, demonstrates how Defendants continue to engage in bad faith and delay. Further, Unger continues to make bold assertions devoid of any real veracity. Since October 19, 1998 Unger has alleged that he has been seeking new counsel, yet as of November 23, 1998, he had still not retained new representation and it appears to this Court that Defendants remain unrepresented. Defendants also claim they lack sufficient funds to post a $50,000 bond, yet in his affidavit, Unger contends Defendants were prepared to pay Academy hundreds of thousands of dollars in attorney's fees. *See* Unger Aff. at ¶ 4. The imposition of a bond is necessary to ensure that any award of costs or award of attorney's fees on appeal will not be a nullity.

*Conclusion*

Accordingly, this Court grants Academy's motion and imposes a bond in the amount of $50,000 pursuant to Rule 7. The Second Circuit has ruled that when determining the amount of a security bond that is required pursuant to Rule 7, a district court may consider the cost of attorney's fees on appeal. *See Adsani,* 139 F.3d at 74–76. Further, as this Court noted in its July 13, 1998 opinion, the Lanham Act provides for the award of attorney's fees in "exceptional cases." *See* 15 U.S.C. § 1117(a); *Tri–Star* 14 F.Supp.2d. at 364. As this Court found that because of Defendants' intentional infringement and bad faith an award of attorney fees was appropriate on the trial level and as Defendants are continuing to demonstrate bad faith in their pursuit of an appeal, this Court believes that an award of attorney fees on appeal is likely. As such, requiring Defendants to post a $50,000 bond to appeal is equitable and vital to uphold the policy underlying Rule 7. This bond provides security unrelated to the award of attorney's fees at trial and only with regard to the merits of this appeal and Defendants' conduct in pursuing this appeal. SO ORDERED.