**René SYLER, Plaintiff,**

v.

**Lee WOODRUFF and Random House, Inc., Defendants.**

**No. 09 Civ. 3944 (SCR).**

United States District Court,
S.D. New York.

April 23, 2009.

Gregor N. Neff, Kramer Levin Naftalis et ano., New York, NY, for Plaintiff.

## MEMORANDUM DECISION AND ORDER

STEPHEN C. ROBINSON, District Judge.

René Syler commenced this action against Lee Woodruff and Random House, Inc. ("Random House") (collectively, the "defendants") alleging claims of false designation of origin, in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1), and infringement of a registered trademark, in violation of section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1). Concurrent with the filing of her Complaint, Ms. Syler also filed an application for a temporary restraining order and a preliminary injunction, pursuant to Rule 65 of the Federal Rules of Civil Procedure, seeking to enjoin the defendants from advertising, selling, or promoting any book or lecture using Ms. Syler's registered trademark, PERFECTLY IMPERFECT. Specifically, Ms. Syler seeks

to enjoin the further printing, distribution, and promotion of a book—published two days ago, on April 21, 2009—entitled *Perfectly Imperfect: A Life in Progress,* which has been written by Ms. Woodruff and published by Random House. In addition, Ms. Syler alleges that Ms. Woodruff is scheduled to give a lecture on April 28, 2009, in the Overland Park Convention Center in Overland Park, Kansas; the title of the lecture is "Perfectly Imperfect." Ms. Syler claims that she delivered a lecture at the same venue and under the same title several weeks ago, and she seeks to enjoin Ms. Woodruff from delivering the April 28 lecture.

After receiving Ms. Syler's Complaint and other submissions, the Court scheduled oral argument for 3:00 p.m. on April 21, 2009. Counsel for all parties entered an appearance, the hearing was held, and the Court reserved its decision. Thereafter, the Court requested that the parties submit supplemental, simultaneous memoranda of law addressing, among other things, the proper standard for the issuance of a temporary restraining order and preliminary injunction in the context of trademark infringement claims.

For the reasons set forth in this opinion, the Court denies Ms. Syler's request for a temporary restraining order and preliminary injunction.

## I

## BACKGROUND

Ms. Syler is a former television news anchorwoman, and, for the past two years, she has worked as a paid lecturer. Ms. Syler speaks on topics of primary interest to women, such as breast cancer and child rearing, due in part to her losses and fight against the disease. She has lectured in many cities across the United States, including New York, Boston, Pittsburg, Houston, Overland Park, and Greensboro, and her lectures have been advertised on the Internet and in several breast cancer publications.

In early 2007, Ms. Syler wrote, and Simon & Schuster published, a book entitled, *Good Enough Mother; The Perfectly Imperfect Book of Parenting.* On the front cover of the book, the subtitle (*The Perfectly Imperfect Book of Parenting*) appears in black ink, except for the word "Imperfect," which is italicized and appears in red ink. The spine of the book features only the main title (*Good Enough Mother*). Ms. Syler is pictured on the cover, flanked (presumably) by her two children.

Ms. Syler's book is written from an autobiographical perspective, and it is about the difficulties that women face in attempting to balance their family, work, and personal lives. The product description appearing on Amazon.com's website, for example, explains:

> In an ideal world, mothers would have time to hand-sew their kids' costumes for the school play, prepare all-organic meals, and volunteer in the classroom at the drop of a hat. In reality, most moms have to settle for plopping their little ones in front of *SpongeBob* so that they can prepare yet another chicken nugget-based dinner, guiltily convinced they're falling down on the job.

> In *Good–Enough Mother,* Renè Syler pulls back the curtain to reveal the truth about modern mothering and reassure time-stressed moms that even if their children are strangers to made-from-scratch cookies, they can emerge as happy, well-adjusted, fully functioning members of society. Mother to two great kids of her own, Syler explains how she learned to chuck perfection for practicality—in short, how she became a Good–Enough Mother. She shows other wom-

en seeking to balance family, work, and some semblance of a personal life how to happily join the ranks of Good–Enough Mothers, who occasionally serve breakfast for dinner yet give their children plenty of what really matters—love, time, and support.

Each essay provides welcome empathy and sage advice on navigating life's different obstacles, whether it's dealing with annoying Supermoms, bluffing through a third grader's math homework, or coping with the words that strike terror into every parent's heart ("Your son's teacher on line one"). Offering real wisdom tempered with humor and warmth, *Good–Enough Mother* will have every modern mom laughing in relief and recognition.

*See* Amazon.com: Good–Enough Mother: The Perfectly Imperfect Book of Parenting: René Syler, Karen Moline, http://www.amazon.com/Good-Enough-Mother-Perfectly-Imperfect-Parenting/dp/141693491X (last visited April 21, 2009).

Ms. Syler claims that she has used the mark PERFECTLY IMPERFECT as a trademark for several other products, including a book of essays and a cookbook, which have been published and distributed at lectures given by Ms. Syler. These materials, however, have not been introduced into the record. Ms. Syler registered this mark with the United States Patent and Trademark Office ("USPTO")

on September 30, 2008,[1] and then again on March 31, 2009.[2] The book has been widely publicized, and Ms. Syler has appeared at many book signings and presentations at bookstores, clubs, television stations, and hospitals in a number of different states. Perhaps most notably, Ms. Syler was interviewed by Larry King and Oprah Winfrey in connection with her book, and the *Washington Post's* website featured an article reviewing the book. Finally, Ms. Syler claims to have "planned and made substantial progress towards extending the use of PERFECTLY IMPERFECT to several other projects and products," including a television sitcom using the mark, additional books, and a cancer research/treatment fundraising project. *See* Affidavit of René Syler ("Syler Aff.") ¶ 19 & Exh. D.

In late March 2009, Ms. Syler first learned that the defendants were planning on releasing Ms. Woodruff's new book entitled, *Perfectly Imperfect: A Life in Progress.* The cover of Ms. Woodruff's book features her sitting on what appears to be child's desk and chair. The name "Lee Woodruff" appears in large white block letters. Like Ms. Syler's book, the word "Imperfect" is written in red letters, whereas the word "Perfect" appears in black.

Ms. Woodruff's book, also autobiographical, features a series of essays on "being a

---

1. Ms. Syler's first registration of the mark PERFECTLY IMPERFECT with the USPTO was for the following uses: series of prerecorded electronic media, namely, audio/video discs and tapes, digital recording discs and tapes featuring instruction and speeches, and music and sound effects on topics of interest to women.

2. Ms. Syler's second registration of the mark was for the following uses: albums, namely, photograph and scrapbook albums; bookmarkers, brochures and pamphlets featuring topics of interest to women, bumper stickers, calendars, coasters made of paper, cookbooks, day planners, decals and stickers, greeting cards, hat boxes of cardboard, magazines featuring topics of interest to women, newsletters featuring topics of interest to women, napkins made of paper, notebooks, paper party favors, pens and pencils, pen and pencil holders, postcards, posters, series of books featuring topics of interest to women, stationery, syndicated column featuring topics of interest to women, table linens of paper, and writing pads.

busy mother, wife and friend who doesn't always know the right answers." Affidavit of Laura Goldin ("Goldin Aff.") ¶ 2. The Publisher's Weekly review that appears on Amazon.com's website states:

Following her memoir of healing, coauthored with her husband, Bob Woodruff, an ABC journalist gravely wounded in a bomb attack in Iraq (*In an Instant*), Lee delivers a collection of 17 brief, plainspoken essays about being a busy mother to four kids and a loving wife, daughter and friend who doesn't always know the right answers. Navigating the adolescence of her two oldest kids, Mark and Cathryn, focuses much of her parenting effort, and where the whole clan was once comfortable with nonchalant nudity, once her son turned into Mr. Hyde and her daughter into an eye-rolling critic, the bathroom door is sealed tighter than a government nuclear testing ground in New Mexico. In the essay A Different Ability, Woodruff writes movingly of first learning about her younger daughter's deafness (Nora and her twin sister were born by surrogate) and how a personal tragedy has been transformed in time to a testament to the resilience of the human spirit. Similarly, Lee writes of the sustaining friendship with Melanie, whose own journalist husband died in Iraq, through the initial hours of grief when she learned of Bob's injuries. Lee moves fluently from deep to lighter subjects, such as worrying about her sagging knees or bemoaning her otherwise ideal husband's woeful gift-selecting ability. Self-deprecating and modest, Woodruff is certainly likable, and this collection will broaden her appeal.

Amazon.com: Perfectly Imperfect: A Life in Progress: Less Woodruff, Bob Woodruff: Books, http://www.amazon.com/Perfectly-Imperfect-Progress-Lee-Woodruff/dp/1400067316 (last visited April 21, 2009). The official publication date of the defendants' book was April 21, 2009, and, in anticipation of that date, Random House shipped approximately 54,000 copies of the book to retailers, internet booksellers, and wholesale accounts. The book is currently for sale to consumers across the country.

Ms. Woodruff is scheduled to give a lecture on April 28, 2009, in the Overland Park Convention Center in Overland Park, Kansas. The title of the lecture is "Perfectly Imperfect," and one advertisement for the event stated that "[p]roceeds benefit the Goppert Center for Breast Care at Saint Luke's South of Saint Luke's Heath System." Syler Aff. ¶ 16 & Exh. K.

On March 26, 2009, Ms. Syler, through counsel, contacted Random House to assert the defendants' book infringed upon her trademark. Ms. Syler indicated her willingness, as an alternative means of resolving the dispute, to consider granting the defendants "a license under her PERFECTLY IMPERFECT trademark." Goldin Aff. ¶ 3. Random House responded, by letter dated April 14, 2009, and it took the position that the Court of Appeals for the Second Circuit "has held that literary titles do not violate the Lanham Act unless the title has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless the title explicitly misleads as to the source of the contends of the work." Goldin Aff. ¶ 4 (quoting *Twin Peaks Prods. v. Publ'n Int'l*, 996 F.2d 1366, 1379 (2d Cir.1993)). This suit followed soon thereafter.

## II

### DISCUSSION

█ In her application for a temporary restraining order and preliminary injunction, Ms. Syler contends that she will suffer irreparable harm if the defendants are

not enjoined from promoting, advertising, and publishing their book using the phrase "Perfectly Imperfect." Ms. Syler also contends that she has a likelihood of success on the merits because her trademark is worthy of protection and the defendants' use of her mark is likely to cause consumer confusion under the factors that the Second Circuit set forth in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.1961).

The defendants, in opposition, claim that Ms. Syler has not met the first element required for the issuance of a temporary restraining order and preliminary injunction—irreparable harm—because she can be made whole by an award of money damages, which, in the defendants' view, could be readily calculated. Furthermore, the defendants also seek refuge under the First Amendment defense created by the Second Circuit in *Rogers v. Grimaldi*, 875 F.2d 994, 999 (2d Cir.1989).

The Court begins with the legal standards governing the issuance of a temporary restraining order and preliminary injunction in the context of a trademark infringement claim.

### A. Standard for the Issuance of an Injunctive Order

 A party seeking a temporary restraining order and preliminary injunction generally must establish two elements: (1) the likelihood of irreparable injury in the absence of an order or injunction; and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for the litigation plus a balance of hardships "tipping decidedly" in that party's favor.[3] *Federal Express Corp. v. Federal Espresso, Inc.*, 201 F.3d 168, 173 (2d Cir.2000). The Court of Appeals for the Second Circuit has defined "irreparable harm" as "an injury that is not remote or speculative but actual and imminent, and 'for which a monetary award cannot be adequate compensation.'" *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 37 (2d Cir.1995) (quoting *Jackson Dairy, Inc. v. HP. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979)). Also falling within the ambit of "irreparable harm" are situations where "there is a threatened imminent loss that will be very difficult to quantify at trial." *Id.* at 38. "This rule is necessary," the Second Circuit has reasoned, "to avoid the unfairness of denying an injunction to a plaintiff on the ground that money damages are available, only to confront the plaintiff at trial on the merits with the rule that damages must be based on more than speculation." *Id.*

In accordance with these general principles, the Second Circuit has held that in the context of trademark infringement claims, " 'a showing of likelihood of confusion [with respect to the merits of the trademark claim] establishes both a likelihood of success on the merits *and irreparable harm.*'" *Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d

---

**3.** A typical preliminary injunction is prohibitory, and it seeks to maintain the status quo pending a trial on the merits. If the preliminary injunction seeks to "alter the status quo by commanding some positive act," however, it is a mandatory injunction. *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir.1995). Parties seeking to obtain a mandatory injunction must satisfy a much more burdensome test. A mandatory injunction should issue, the Second Circuit has explained, "only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." *Id.* (internal quotation marks and citation omitted). In this case, Ms. Syler seeks a prohibitory injunction because she no longer seeks an order requiring the defendants to recall the approximately 54,000 copies of the defendants' book that already has been shipped.

532, 537 (2d Cir.2005) (emphasis supplied) (quoting *Hasbro, Inc. v. Lanard Toys, Ltd.,* 858 F.2d 70, 73 (2d Cir.1988)); *Brennan's, Inc. v. Brennan's Rest., LLC,* 360 F.3d 125, 129 (2d Cir.2004) (same); *Virgin Enters. Ltd. v. Nawab,* 335 F.3d 141, 146 (2d Cir.2003) (same); *Genesee Brewing Co., Inc. v. Stroh Brewing Co.,* 124 F.3d 137, 142 (2d Cir.1997) (opinion of Calabresi, J.) ("In the context of trademark and unfair competition injunctions, the requirement of irreparable harm carries no independent weight, as we have held that a showing of likelihood of confusion (a requirement of both trademark infringement and unfair competition claims) establishes irreparable harm."); *Tough Traveler, Ltd. v. Outbound Prods.,* 60 F.3d 964, 967 (2d Cir.1995); *Artisan Mfr. Corp. v. All Granite & Marble Corp.,* 559 F.Supp.2d 442, 449 (S.D.N.Y.2008). The Second Circuit explained the rationale behind this rule in *Omega Imp. Corp. v. Petri–Kine Camera Co.*:

> Where there is, then, such high probability of confusion, injury irreparable in the sense that it may not be fully compensable in damages almost inevitably follows. While an injured plaintiff would be entitled to recover the profits on the infringing items, this is often difficult to determine; moreover, a defendant may have failed to earn profits because of the poor quality of its product or its own inefficiency. Indeed, confusion may cause purchasers to refrain from buying either product and to turn to those of other competitors. Yet to prove the loss of sales due to infringement is also notoriously difficult. Furthermore, if an infringer's product is of poor quality, or simply not worth the price, a more lasting but not readily measurable injury may be inflicted on the plaintiffs reputation in the market.

451 F.2d 1190, 1195 (2d Cir.1971) (internal citations omitted). Other Courts of Appeals have applied this principle as well. *See, e.g., Camel Hair & Cashmere Instit. of Am., Inc. v. Assoc. Dry Goods Corp.,* 799 F.2d 6, 14 (1st Cir.1986) (holding that "the irreparable injury requirement is satisfied once it is shown that the defendant is wrongfully trading on the plaintiff's reputation"); *DaimlerChrysler v. The Net Inc.,* 388 F.3d 201, 208 (6th Cir.2004) ("Irreparable harm is presumed from defendants [*sic*] infringement of plaintiff's mark ....." (internal quotation marks and citation omitted)); *Eli Lilly & Co. v. Natural Answers, Inc.,* 233 F.3d 456, 469 (7th Cir. 2000) (same).

This general rule, of course, must not be applied in a slavish or perfunctory manner. *Citibank, N.A. v. Citytrust,* 756 F.2d 273, 275 (2d Cir.1985) (reversing a district court's issuance of an injunction because it disposed of the irreparable harm element with a "perfunctory comment" and citation to *Omega* ). Although cases within the Second Circuit "clearly say that establishing a high probability of confusion as to sponsorship almost inevitably establishes irreparable harm," the court has warned that the cases also "leave[ ] the door slightly ajar perhaps for those few cases in other trademark contexts where irreparable harm does not follow." *Church of Scientology Int'l v. Elmira Mission of the Church of Scientology,* 794 F.2d 38, 41–42 (2d Cir.1986).

In this case, Ms. Syler likely would suffer irreparable harm in the absence of the issuance of an injunctive order for the reasons set forth in *Omega.* Were Ms. Syler to establish a strong likelihood of consumer confusion, it would be extraordinarily difficult for her to delineate with any certainty her lost profits resulting from a lack of traditional book sales or from missed opportunities or sales on the lecture circuit. *Cf. SMJ Group, Inc. v. 417 Lafayette Rest. LLC,* 439 F.Supp.2d 281,

294 (S.D.N.Y.2006) (finding the rule in *Omega* inapplicable because, *inter alia*, the defendants did not profit from the distribution of leaflets, which were the allegedly infringing products, and "therefore there would be no need to engage in a speculative disgorgement calculation should plaintiffs prevail at trial"). It would be similarly difficult to calculate with certainty the lost profits and diminution of reputation and fame resulting from consumers' association of Ms. Syler with the defendants' (potentially) poorly conceived, poorly written, or poorly edited book. Ms. Syler therefore has satisfied the first hurdle required for the issuance of an injunctive order, and the Court turns to the next hurdle that Ms. Syler must clear.

## B. Probability of Success on the Merits of the Trademark Infringement Claims

■ A claim of trademark infringement, whether brought under section 32(1)(a) of the Lanham Act, 15 U.S.C. § 1114(1), or under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1), is analyzed using a familiar two-prong test. Under this test, Ms. Syler will prevail on the merits of her trademark infringement claim if she can establish that she "has a valid mark entitled to protection and that the defendant[s'] use of it is likely to cause confusion" as to the source or origin of the goods or services. *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 390 (2d Cir. 1995). Generally, a mark is entitled to protection if it is "inherently distinctive or, if merely descriptive, has acquired 'secondary meaning.'" *Id.* at 390 (quoting *Merriam–Webster, Inc. v. Random House, Inc.*, 35 F.3d 65, 70 (2d Cir.1994)). In evaluating the second element of a trademark claim—the likelihood of consumer confusion—courts look to the factors that the Second Circuit first set forth in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.1961). These factors are: the strength of the mark; the degree of similarities between the two marks; the competitive proximity of the products; evidence of actual confusion; the likelihood that the plaintiff will bridge the gap by selling the product being sold by the defendants; the defendants' good faith in adopting the mark; the quality of the defendants' product; and the sophistication of the products. The *Polaroid* factors must be applied with an eye toward the likelihood of consumer confusion, and no factor is dispositive of this inquiry. *See Virgin Enters. Ltd.*, 335 F.3d at 146.

■ When allegedly infringing marks are used in connection with literary titles—rather than mundane commercial merchandise—the traditional trademark infringement inquiry must be informed by First Amendment concerns about free expression. *See Rogers v. Grimaldi*, 875 F.2d at 998 n. 3 ("[T]rademark law has also accorded greater leeway for the use of titles than for names of ordinary commercial products, thus allowing breathing space for free expression."). Indeed, one treatise aptly remarks that "[t]he law of literary titles is unique. . . ." 2 J. Thomas McCarthy, Trademarks and Unfair Competition § 10:2 (4th ed. 2009). Courts must be vigilant in narrowly construing the Lanham Act in the area of titles because of the serious constitutional concerns that could arise should it encroach on free expression. *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Construction Trades Council*, 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress."). Consequently, concerns about free expression have led to several

important qualifications to the general trademark infringement inquiry.

■ First, and foremost in this case, the Second Circuit "has applied a more stringent rule to literary titles in requiring the trademark proprietor to demonstrate secondary meaning [4] notwithstanding the suggestive nature of the title." [5] *Twin Peaks Prods.*, 996 F.2d at 1379 n. 4; *see also EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos*, 228 F.3d 56, 63 (2d Cir.2000) ("Titles of works of artistic expression, including films, plays, books, and songs, that have acquired secondary meaning are protected" under the Lanham Act.). *See generally* 2 McCARTHY, *supra,* § 10:2 ("[T]he courts have given trademark protection to literary titles of one-shot, single works only upon a showing of secondary meaning, even though the title is not descriptive of the contents of the work. Regardless of the arbitrary or fanciful nature of the title as compared with the contents of the single book, play, movie, record, etc., secondary meaning is required."). As a result of the First Amendment concerns that suffuse the naming of literary works, courts in this Circuit have required a "particularly compelling" likelihood of confusion before finding infringement under the Lanham Act. *See Twin Peaks Prods.*, 996 F.2d at 1379; *Simon & Schuster, Inc. v. Dove Audio, Inc.*, 970 F.Supp. 279, 296 (S.D.N.Y.1997) (internal quotation marks and citation omitted).

The second manner in which First Amendment concerns affect the traditional trademark infringement inquiry was first explained by the Second Circuit in *Rogers v. Grimaldi.* In *Rogers*, the court held that, in the context of the title of artistic works, infringement will not be found "unless the title has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless the title explicitly misleads as to the source or the content of the work." 875 F.2d at 999. Notably, however, the court limited the reach of its holding: It cautioned that this standard "would not apply to misleading titles that are confusingly similar to other titles. The public interest in sparing consumers this type of confusion outweighs the slight public interest in permitting authors to use such titles." *Id.* at 999 n. 5.

Finally, concerns about free expression also have led courts to scrutinize whether the allegedly infringing mark is used to designate the source or origin of the book. In most circumstances, the purchaser of a book, in contrast to the purchaser of typical commercial items, "is not asking for a 'kind' or 'make' of book. He is pointing out which one out of millions of distinct titles he wants, designating the book by its name." *Sugar Busters LLC v. Brennan*, 177 F.3d 258, 268 (5th Cir.1999) (internal quotation marks and citation omitted). For example, the Second Circuit explained in *Rogers* that many titles featuring a "celebrity's name make no explicit statement that the word is about that person in any direct sense; the relevance of the title may be oblique and may become clear only after viewing or reading the work." *Id.* at 1000 (contrasting the titles "The True Life

---

4. Whether a mark has acquired secondary meaning is determined using six factors: (1) advertising expenditures; (2) consumer studies linking the mark to a source; (3) unsolicited media coverage of the product; (4) sales success; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the mark's use. *Genesee Brewing Co.,* 124 F.3d at 143 n. 4.

5. It appears that the Second Circuit has not ruled definitively on this issue. *See Twin Peaks Productions,* 996 F.2d at 1379 ("We need not determine whether such a showing is required for suggestive literary titles.").

Story of Ginger and Fred," which suggests a direct connection to the individual or trademark, with "Ginger and Fred"). If the allegedly infringing mark is not used in a traditional trademark way—that is, to designate the source or origin of the book—then "the consumer interest in avoiding deception is too slight to warrant application of the Lanham Act." *Id.*; *see also* 2 McCarthy, *supra*, § 23:11.50 ("[I]f the defendant does not use the accused designation as defendant's own identifying trademark, then confusion will usually be unlikely. Then there are not the requisite two similar marks confusing the viewer into believing that the two marks identify a single source."). Accordingly, Ms. Syler must show that it is likely that consumers will believe that the phrase "Perfectly Imperfect" in the title of the defendants' book, *Perfectly Imperfect: A Life in Progress,* is a designation of the source of the book and thereby be confused.

The applicability of the foregoing First Amendment principles, in combination with the undeveloped record regarding Ms. Syler's precise use of the mark PERFECTLY IMPERFECT and any secondary meaning that the mark has acquired, leads the Court to conclude that Ms. Syler cannot, at this stage of the proceedings, establish a probability of success on the merits of her trademark infringement claim. Ms. Syler seeks to apply the Lanham Act to prevent the defendants from using the book title of their choice, and, therefore, she must demonstrate that her mark PERFECTLY IMPERFECT has acquired secondary meaning. *Twin Peaks Prods.,* 996 F.2d at 1379 n. 4; *EMI Catalogue P'ship,* 228 F.3d at 63; 2 McCarthy, *supra*, § 10:2. None of the six secondary

meaning factors, however, weigh in Ms. Syler's favor.

To begin with, Ms. Syler has introduced little—if any—evidence that her book is known to consumers by the mark PERFECTLY IMPERFECT. Although Ms. Syler certainly has introduced a number of exhibits showing that her book, and lectures about her book, have received a great deal of publicity and advertising—two factors probative of secondary meaning, *see Genesee Brewing Co.,* 124 F.3d at 143 n. 4—none of those exhibits refer to her book or her lectures exclusively or predominantly by the mark PERFECTLY IMPERFECT. *See* Syler Aff. Exh. A–D & G–J. Instead, all of the exhibits refer to her book by its full name, *The Good–Enough Mother: The Perfectly Imperfect Book of Parenting.* Indeed, contrary to Ms. Syler's claim that "Perfectly Imperfect" is the "dominant part" of the book's title, *see* Syler Aff. ¶ 6, some of these advertisements emphasize in capital lettering the book's main title (*Good–Enough Mother*), and the spine of the book itself displays only the main title.[6] *See* Syler Aff. Exh. D, H. Also absent from the record are the total number of copies of Ms. Syler's book that have sold, the precise number of lectures that she has given, the amount of money that has been used to advertise the book, and any evidence of actual consumer confusion. *See, e.g., Sugar Busters,* 177 F.3d at 269–70.

Moreover, despite Ms. Syler's claim to have used the mark PERFECTLY IMPERFECT in connection with other books and pamphlets that were published and distributed in "moderate numbers," *see* Syler Aff. ¶ 9, she has not introduced into the record any other books or pamphlets using that mark. Likewise, when Ms. Syl-

---

**6.** Indeed, it would seem somewhat abstruse to refer to Ms. Syler's book solely under the mark PERFECTLY IMPERFECT given that the book's main title is so much more descriptive of the contents of the book.

er first registered the mark PERFECTLY IMPERFECT in September 28, 2008, she did not obtain registration for its use in connection with books or pamphlets, and it was only *after* Ms. Syler discovered that the defendants were about to release a book incorporating those words that she registered the mark for printed matter. *Compare supra* note 1 *with supra* note 2. Indeed, the original registration date of the mark, along with her book's publication date (early 2007), establishes that Ms. Syler's mark not been in use for a long period of time. *See Genesee Brewing Co.*, 124 F.3d at 143 n. 4 (listing the length of the mark's use as a secondary meaning factor).

These facts are damaging to Ms. Syler's contention that PERFECTLY IMPERFECT has acquired secondary meaning so that consumers associate it with her work. Under these circumstances, this Court cannot find a "particularly compelling" likelihood of confusion between the two books. *See Twin Peaks Prods.*, 996 F.2d at 1379; *Simon & Schuster, Inc.*, 970 F.Supp. at 296. As the Second Circuit counseled in *Rogers*, "consumers frequently look to the title of a work to determine what it is about, [but] they do not regard titles of artistic works in the same way as the names of ordinary commercial products." 875 F.2d at 1000. Given such consumer behavior and given the lack of evidence showing that her book or lectures have acquired secondary meaning under the mark PERFECTLY IMPERFECT, Ms. Syler has not established a probability of success on the merits of her trademark infringement claim.[7]

## Conclusion

As Judge Learned Hand explained long ago, "A title is, if not strictly descriptive, at least suggestive, and not an arbitrary sign.... [A] title is the proper name of a specific thing, *not the differential of a species*, as in the case of fungibles." *Int'l Film Srv. Co. v. Assoc. Producers*, 273 F. 585, 587 (S.D.N.Y.1921) (emphasis added). The defendants' book title—*Perfectly Imperfect: A Life in Progress*—does not designate the book's source or origin. Because Ms. Syler has not adduced sufficient evidence at this early stage in the proceeding to establish a particularly compelling likelihood of confusion between the two books due to her mark's secondary meaning among consumers, this Court cannot grant an injunctive order—"one of the

---

7. Ms. Syler contends that, under the analysis conducted in *Orion Pictures Co. v. Dell Publishing Co.*, 471 F.Supp. 392 (S.D.N.Y.1979), her interviews on the Oprah and Larry King are sufficient to establish secondary meaning. The Court disagrees. In *Orion*, the producer and distributor of a major motion picture, derived from a book originally published in French, sued the publisher of the paperback version of the English translation of the book and requested a preliminary injunction. The court found that the motion picture producer had established secondary meaning due to its pre-release advertising and publicity and, in any event, the court held that "secondary meaning in the making" is protected under the Lanham Act. *Id.* at 396. Critical to the *Orion* court's decision were the particular circumstances under which the infringing mark had been used. The title of the motion picture and allegedly infringing book was identical ("A Little Romance"). *Id.* at 394. Moreover, the allegedly infringing book featured a pronouncement on the front cover that it was "NOW A MAJOR MOTION PICTURE," and it depicted on the front cover three individuals who bore noticeable resemblances to Laurence Olivier and the two child stars of the motion picture. *Id.* Unlike here, the producer of the motion picture in *Orion* spent *"millions of dollars"* on pre-release advertising. *Id.* at 395 (emphasis supplied). *Orion*, in short, presents drastically different facts and circumstances than the present case. Finally, and as noted in the text, during Ms. Syler's appearance on those television programs, her book was pitched under its full title rather than under the mark PERFECTLY IMPERFECT.

most drastic tools in the arsenal of judicial remedies." *Hanson Trust PLC v. SCM Corp.*, 774 F.2d 47, 60 (2d Cir.1985).

*It is so ordered.*